UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

DANIEL C. CADLE, Individually and
Derivatively on Behalf of the Corporation
and the Shareholders of iGate, Inc.                                    PLAINTIFF


v.                                            CIVIL ACTION NO. 3:07-CV-00070-CRS


WILLIAM J. JEFFERSON, ANDREA G.
JEFFERSON, THE ANJ GROUP, LLC,
VERNON L. JACKSON and JOHN DOES
1-100                                                                 DEFENDANTS

**<u>MEMORANDUM OPINION</u>**

I.    <u>Introduction</u>

This matter is before the Court on the motion of Plaintiff Daniel C. Cadle, individually[1]

and derivatively on behalf of the corporation and the shareholders of iGate, Inc. ("iGate") for

partial summary judgment, ECF No. 113. Defendant Vernon L. Jackson responded, ECF No.

119. Cadle replied, ECF No. 127. Defendant William J. Jefferson also responded, ECF No. 122.

Cadle replied, ECF No. 128.

Jefferson filed a cross-motion for partial summary judgment, ECF No. 121. Cadle

responded, ECF No. 126. Jefferson replied, ECF No. 131. Because these motions involve the

same facts and legal issues, the Court will address them in a single memorandum opinion and

order.

---

[1] This Court previously dismissed Cadle's claims to the extent that they are pled by Cadle
individually because Cadle failed to allege a unique injury. Mem. Op. 4, ECF No. 77.

For the reasons stated below, the Court will grant in part and deny in part Cadle's motion for partial summary judgment. The Court will grant in party and deny in part Jefferson's motion for partial summary judgment.

## II.   Summary Judgment Standard

A party moving for summary judgment must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). A genuine issue for trial exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* The Court must draw all factual inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.   Background

### A.   Facts

Jackson founded iGate, a telecommunications broadband business, in 1998. Trial Tr. 128, ECF No. 113-2. iGate's technology allowed for high speed information—audio, data, and video—to be simultaneously transmitted over copper telephone lines. *Id.* In mid to late 2000, Jackson met Jefferson, who was a Congressman at the time.[2] Trial Tr. 128, ECF No. 113-2; Jefferson Dep. 11, ECF No. 113-4. They met at a trade show in Chicago where Jackson was displaying iGate's technology. *Id.* Soon after, Congressman Jefferson introduced Jackson to United States Army General James Hylton to promote iGate's product for use in the United States Army. Trial Tr. 136–37, ECF No. 113-2; Jefferson Dep. 12, ECF No. 113-4. At that meeting, Congressman Jefferson told General Hylton that iGate's product would save the

---

[2] Although Jefferson is no longer a Congressman, the Court will refer to Jefferson as "Congressman Jefferson" or "the Congressman" for purposes of clarity.

government money and that its product needed to be tested by the Army. Trial Tr. 137, ECF No. 113-2. Based on Congressman Jefferson's suggestion, General Hylton agreed and decided that the Army should test iGate's product. *Id.* at 137–38. Testing began within two weeks. *Id.* at 141. This testing enabled the government to purchase and use iGate's product. *Id.* at 139. It was installed on a trial basis at Fort Stewart in Georgia. Trial Tr. 240, ECF No. 113-5.

After the testing began, Congressman Jefferson approached Jackson and told him that the Congressman "could no longer spend the time with [Jackson] or work with [Jackson] on this product and services." Trial Tr. 141–42, ECF No. 113-2. Congressman Jefferson told Jackson that iGate "needed a company now to get with [Jackson] and market these products to high-end decision makers in the corporate sector as well as government people." *Id.* at 142. Congressman Jefferson suggested that Jackson work with Defendant The ANJ Group, LLC ("ANJ"). *Id.* Congressman Jefferson informed Jackson that ANJ was owned by the Congressman's wife, Andrea Jefferson, and daughters. *Id.* This information "sent up a red flag" for Jackson, but Congressman Jefferson assured Jackson that it would be permissible to do business with ANJ because the Congressman had no interest in the company. *Id.*

Congressman Jefferson then sent Jackson a draft contract offer from ANJ. *Id.* at 143. Jackson, as chairman and CEO of iGate, entered into a personal services agreement ("the Agreement") with Andrea Jefferson as president of ANJ. *Id.* at 151. Under the Agreement, iGate agreed to pay ANJ $7,500 per month, in addition to providing 1,000,000 stock options at a price of $2.50 per share. Agreement ¶ 3, ECF No. 113-6.

Jackson soon noticed that he was still working with Congressman Jefferson, even though he was purportedly working with ANJ. Trial Tr. 164, ECF No. 113-2. As far as Jackson could tell, Andrea Jefferson never performed under the contract. *Id.* at 164–65. Jackson continued to

pay ANJ consulting fees, however, because he "realized the congressman had actually been very effective and resourceful in getting things done . . . . And [he] certainly did not want to cross [Congressman Jefferson] in any way, shape, or form." *Id.* at 165. In other words, Jackson did not want to alienate Congressman Jefferson by not paying on the contract. *Id.* Jackson believed that he would not have gotten a meeting with the Army Corps of Engineers, for example, without Congressman Jefferson's help. Trial Tr. 28, ECF No. 113-7. And Jackson believed that Congressman Jefferson helped him because he was paying the Congressman to do so. *Id.* Jackson noticed that invoices from ANJ were delivered to him either in person from Congressman Jefferson or by facsimile. *Id.* at 25. At least one of these invoices contained Congressman Jefferson's handwriting. *Id.* at 38. In fact, wire transfers to ANJ were being routed to an account listed in Congressman Jefferson's name. Jefferson Dep. 47–50, ECF No. 113-4. Altogether, between February 2001 and September 2004, iGate paid ANJ $362,500 in checks and wire transfers as follows:

| Date | Amount | Method |
|---|---|---|
| February 15, 2001 | $7,500.00 | Check |
| April 11, 2001 | $7,500.00 | Wire Transfer |
| May 7, 2001 | $7,500.00 | Check |
| June 18, 2001 | $7,500.00 | Check |
| July 27, 2001 | $7,500.00 | Check |
| June 2, 2003 | $25,000.00 | Check |
| January 23, 2004 | $200,000.00 | Wire Transfer |
| July 26, 2004 | $50,000.00 | Wire Transfer |
| September 23, 2004 | $50,000.00 | Wire Transfer |

iGate Payments, ECF No. 113-17. After only two or three months Jackson had accepted that, even though it was "inappropriate" and "wrong," he was paying Congressman Jefferson $7,500 a month under the Agreement to promote "iGate's products and services from his congressional offices." Trial Tr. 166–67, ECF No. 113-2.

4

In addition to the cash payments, Jackson also issued hundreds of thousands of shares of iGate stock to ANJ. Stock Docs., ECF No. 113-8; Jefferson Dep. 22–30, ECF No. 113-4; Trial Tr. 178–80, 191–94, ECF No. 113-2. Although the Agreement set the price of these shares at $2.50 per share, Jackson issued the shares to ANJ for free. Jefferson Dep. 22–30, ECF No. 113-4; Trial Tr. 178, ECF No. 113-2. Jackson issued them for free because he felt that Congressman Jefferson was performing services for the shares and because he did not want to alienate the Congressman. Trial Tr. 178–79, 193–94, ECF No. 113-2.

Meanwhile, in 2003, Congressman Jefferson contacted Jackson and told Jackson that he had met with a company in Africa called Netlink Digital Television ("NDTV") that was interested in using iGate to get broadband services or internet access in Nigeria. *Id.* at 195–96. Congressman Jefferson invited Jackson to fly to London, where Jackson met with members of the NDTV team. *Id.* at 196. Members of the NDTV team then came to the United States to see a demonstration of iGate's products and services. *Id.* at 219. During this trip, NDTV, iGate, and Congressman Jefferson negotiated and reached an agreement for services between NDTV and iGate. *Id.* at 219–20.

Congressman Jefferson then presented Jackson with a proposed amendment to the Agreement between iGate and ANJ. *Id.* at 210. The amendment increased ANJ's share of iGate's profits from 5% to 35% for any business connected with Africa. *Id.* at 211; Amendment, ECF No. 113-11. After this amendment was agreed upon, Congressman Jefferson and Jackson, accompanied by iGate personnel, went to Africa again, where they promoted iGate in Cameroon. Jefferson Dep. 74, ECF No. 113-4; Trial Tr. 101, ECF No. 113-7. iGate paid for the expenses incurred on this trip to Africa. Jefferson Dep. 69–74, 77–79, ECF No. 113-4; Trial Tr. 157–59, 190–92, ECF No. 113-7. iGate paid Congressman Jefferson's American Express credit card bill

on June 16, 2004 in the amount of $14,888.95 to reimburse him for plane tickets to Cameroon. Trial Tr. 158, ECF No. 113-7; Jefferson Dep. 77, ECF No. 113-4; Fraker Email, ECF No. 113-13. On July 30, 2004, iGate again paid Congressman Jefferson's American Express credit card bill in the amount of $14,604.76 for travel expense reimbursements. Fraker Email, ECF No. 113-13.

In 2004, iGate's relationship with NDTV "began to fall apart." Trial Tr. 75, ECF No. 113-7. Following this falling out, Congressman Jefferson invited Jackson to his congressional offices to meet Brett Pfeffer, a former legislative assistant to the Congressman who was, at that time, a consultant for various companies. Jefferson Dep. 95, ECF No. 113-4; Trial Tr. 172, ECF No. 113-7. Pfeffer had introduced Congressman Jefferson to Lori Mody, the CEO of W2, LLC ("W2"), an international broadband services company. Jefferson Dep. 95, ECF No. 113-4; Term Sheet 1, 3, ECF No. 113-16. Congressman Jefferson, in turn, introduced Jackson to Mody. *Id.* iGate, through Jackson, and W2, through Mody, subsequently entered into an agreement to provide broadband services in Nigeria. Term Sheet 1, ECF No. 113-16. These were the same products and services that iGate had previously agreed to provide to NDTV. Trial Tr. 175, ECF No. 113-7.

On August 2, 2005, iGate rescinded 30 million shares of iGate stock from ANJ, citing ANJ's "failure . . . to provide the business opportunities it represented." Aug. 2, 2005 Rescission, ECF No. 119-2. In his affidavit, Jackson stated that iGate would have rescinded all stock issued to ANJ, but it believed that it could not legally take that action because "the previously issued stock was issued pursuant to a valid marketing agreement" with ANJ and ANJ "successfully achieved certain performance levels" under that agreement. Jackson Aff. ¶ 2, ECF No. 119-1. Jackson's counsel later informed him that the agreements between iGate and ANJ may have been

6

illegal and void. *Id.* ¶ 3. This would mean that "any and all compensation paid to [ANJ] should be returned to iGate." *Id.* Thus, on January 25, 2010, Jackson made a notation to check with his counsel regarding the rescission of the remaining 775,000 shares issued to ANJ. *Id.* ¶ 4. But through inadvertence, Jackson failed to issue the rescission. *Id.* ¶ 5. After reviewing Cadle's instant motion for partial summary judgment, Jackson realized the error and has executed a board resolution rescinding 775,000 shares of iGate stock issued to ANJ, "effective as of January 25, 2010." *Id.* ¶¶ 5–6; Dec. 28, 2016 Rescission, ECF No. 119-3. Prior to this effective date, however, in 2006, "iGate ceased its operations, closed its headquarters in Louisville, Kentucky and furloughed all of its employees." Verified Compl. ¶ 41, ECF No. 1.

### B. Procedural History

Congressman Jefferson and Jackson were both criminally prosecuted for the above actions. On May 2, 2006, Jackson waived indictment and pled guilty to (1) conspiracy to commit bribery of a public official under 18 U.S.C. § 371 and (2) bribery of a public official under 18 U.S.C. § 201. Plea Agreement 1, ECF No. 113-18. On June 4, 2007, Congressman Jefferson was indicted on sixteen criminal counts. Jefferson Indictment 1, ECF No. 113-19. He stood trial, and on August 5, 2009 the jury found him guilty on the following counts:

> Count 1: 18 U.S.C. § 371 (Conspiracy to Solicit Bribes by a Public Official, Deprive Citizens of Honest Services by Wire Fraud, and Violate the Foreign Corrupt Practices Act)
>
> Count 2: 18 U.S.C. § 371 (Conspiracy to Solicit Bribes by a Public Official and Deprive Citizens of Honest Services by Wire Fraud)
>
> Counts 3 and 4: 18 U.S.C. § 201(b)(2)(A) (Solicitation of Bribes by a Public Official)
>
> Counts 6, 7, and 10: 18 U.S.C. §§ 1343 and 1346 (Scheme to Deprive Citizens of Honest Services by Wire Fraud)
>
> Counts 12, 13, and 14: 18 U.S.C. § 1957 (Money Laundering)

7

Count 16: 18 U.S.C. § 1962(c) (Racketeer Influenced Corrupt Organization, Pattern of Racketeering Activity (RICO))

*Id.*; Jefferson Jury Verdict, ECF No. 113-20.

On February 12, 2007, Cadle, an iGate shareholder, filed suit individually and derivatively on behalf of the corporation and shareholders of iGate. Compl. 1, ECF No. 1. Cadle asserts ten claims against Defendants: (1) breach of fiduciary duty (Count I), (2) aiding and abetting breach of fiduciary duty (Count II), (3) negligent and/or fraudulent misrepresentation and/or omission (Count III), (4) unjust enrichment and/or disgorgement (Count IV), (5) violation of Kentucky Revised Statutes § 378.010 (Count V), (6) violation of Kentucky Revised Statutes § 378.020 (Count VI), (7) civil conspiracy and aiding/abetting civil conspiracy (Count VII), (8) violation of 18 U.S.C. § 1962(c) (Count VIII), (9) violation of 18 U.S.C. § 1962(b) (Count IX), and (10) violation of 18 U.S.C. § 1962(d). *Id.* at 14–24. This Court previously dismissed Counts V and VI of the complaint, Order, ECF No. 78, as well as all of the claims to the extent that they are pled by Cadle individually, Mem. Op. 4, ECF No. 77.

IV.   Discussion

This matter is before the Court on two motions for partial summary judgment. Cadle moves for partial summary judgment. Cadle Mot. Partial Summ. J., ECF No. 113. Cadle argues that he is entitled to summary judgment against Congressman Jefferson on Count II for aiding and abetting a breach of fiduciary duty, Count IV for unjust enrichment, and Count VII for civil conspiracy. Cadle Mem. Supp. Mot. Partial Summ. J. 13–25, ECF No. 113-1. Cadle argues that he is entitled to summary judgment against Jackson on Count VII for civil conspiracy. *Id.* at 25–27.

Congressman Jefferson also moves for partial summary judgment. Jefferson Mot. Partial Summ. J., ECF No. 121. Congressman Jefferson asserts two arguments: (1) he cannot be liable for any damages to iGate, and (2) Cadle's unjust enrichment claim cannot coexist with the breach of contract claims asserted against him. *Id.* at 1–2. The Court will discuss Congressman Jefferson's motion as it becomes relevant.

Cadle relies on offensive issue preclusion to establish many elements of his claims.[3] *Id.* at 11–13. Offensive use of issue preclusion, otherwise known as collateral estoppel, "occurs when the plaintiff seeks to foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action with another party." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n.4 (1979). "The doctrine has been regularly employed by courts to preclude the litigation of an issue in a civil action already addressed in an associated criminal case." *Westport Ins. Corp. v. Mudd*, No. 1:08-CV-00034-R, 2010 WL 4638760, at *3 (W.D. Ky. Nov. 5, 2010) (citations omitted). Such use of collateral estoppel may be applied against a defendant where four criteria are met:

(1) the precise issue must have been raised and actually litigated in the prior proceedings;

(2) the determination of the issue must have been necessary to the outcome of the prior proceedings;

(3) the prior proceedings must have resulted in a final judgment on the merits; and

(4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*Id.* (citing *Cobbins v. Tenn. Dep't of Transp.*, 566 F.3d 582, 589–90 (6th Cir. 2009)).

---

[3] The Court notes that Congressman Jefferson appears to be under the misconception that Cadle relies solely on issue preclusion to establish every element of every claim. This is not the case. For some elements, Cadle relies on evidence in the record. In those instances, Congressman Jefferson's argument that issue preclusion does not apply is unavailing.

The parties do not dispute that the third and fourth criteria for application of offensive issue preclusion are met here. Congressman Jefferson's criminal trial resulted in a final judgment on the merits. Even in cases where there is a pending appeal, a conviction is a final judgment for the purpose of applying issue preclusion. *May v. Oldfield*, 698 F. Supp. 124, 127 (E.D. Ky. 1988) (citing *Webb v. Voirol*, 773 F.2d 208, 211 (8th Cir. 1985)). In this case, a jury convicted Congressman Jefferson of eleven out of the sixteen criminal counts against him. Jefferson Jury Verdict, ECF No. 113-20. Congressman Jefferson's convictions are sufficiently final to meet the third criterion for application of offensive issue preclusion.

Additionally, Congressman Jefferson had a full and fair opportunity to litigate in the prior proceeding. While the case law is not extensive on the fourth criterion, "[r]edetermination of issues is warranted if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation." *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 481 (1982) (citing *Montana v. United States*, 440 U.S. 147, 164 n.11 (1979)). In this case, like the defendant in *May*, Congressman Jefferson faced years of incarceration in the criminal action, unlike the potential civil liability he faces here. *See* 698 F. Supp. at 127. Thus, he "had both the incentive and the opportunity to challenge" the issues in the criminal action. *See id.* The third and fourth criteria are met for application of offensive issue preclusion.

Congressman Jefferson disputes that the first two criteria are met. Jefferson Resp. Opp. Mot. Partial Summ. J. 2, ECF No. 122. He argues that (1) the precise issues were not raised or actually litigated in his criminal proceedings and (2) the determination of the issues in the current civil case were not necessary to the outcome of his criminal proceedings. *Id.* Because these two criteria require a specific analysis for the three counts on which Cadle is requesting summary judgment, the Court will address them in the sections below.

1.   Aiding and Abetting Breach of Fiduciary Duty (Count II)

Cadle moves for summary judgment against Congressman Jefferson on Count II for aiding and abetting a breach of fiduciary duty. Cadle Mem. Supp. Mot. Partial Summ. J. 13, ECF No. 113-1. He asserts that Congressman "Jefferson aided and abetted Vernon Jackson in breaching Jackson's fiduciary duties to iGate and its shareholders." *Id.* According to the Supreme Court of Kentucky, "a person who knowingly joins with or aids and abets a fiduciary in an enterprise constituting a breach of the fiduciary relationship becomes jointly and severally liable with the fiduciary." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 485 (Ky. 1991) (citing *Jackson v. Smith*, 254 U.S. 586 (1921)). To prevail on this claim in Kentucky, Cadle must show (1) that Jackson breached his fiduciary duty, (2) that Congressman Jefferson gave "substantial assistance or encouragement" to Jackson, and (3) that Congressman Jefferson knew that Jackson's conduct breached a fiduciary duty. *See Miles Farm Supply, LLC v. Helena Chem. Co.*, 595 F.3d 663, 666 (6th Cir. 2010) (citing Restatement (Second) of Torts § 876(b)).

a.   Whether Jackson Breached his Fiduciary Duty

The first element requires Cadle to show that Jackson breached his fiduciary duty. *See id.* "To state a claim for breach of fiduciary duty under Kentucky law, plaintiff must establish that the defendant owed a fiduciary duty, breached that duty, and that the breach caused damages." *Ivan Ware & Son, Inc. v. Delta Aliraq, Inc.*, No. 3:10-CV-00484-CRS, 2016 WL 868840, at *5 (W.D. Ky. Mar. 7, 2016) (citing *Baptist Physicians Lexington, Inc. v. New Lexington Clinic, P.S.C.*, 436 S.W.3d 189, 193 (Ky. 2013)).

Congressman Jefferson does not dispute that Jackson owed a fiduciary duty to iGate or that Jackson breached that duty when he paid bribes to the Congressman. *See* Jefferson Resp. Opp. Mot. Partial Summ. J. 3, ECF No. 122. Jackson was chairman and CEO of iGate. Trial Tr.

151, ECF No. 113-2. Officers of corporations owe fiduciary duties to the corporation. *Steelvest*, 807 S.W.2d at 483. As such, the Court finds that Jackson owed a fiduciary duty to iGate. And it is apparent that Jackson paid bribes to Congressman Jefferson using iGate funds. *See* Trial Tr. 164–65, ECF No. 113-2. An officer's fiduciary duties include the duty not to act against the corporation's interest. *Steelvest*, 807 S.W.2d at 483. It was certainly against iGate's interest when Jackson used iGate funds for an illegal purpose. Thus, the Court finds that Jackson breached his duty when he paid bribes to Congressman Jefferson.

Congressman Jefferson does dispute that Jackson's breach caused damages to iGate. Jefferson Resp. Opp. Mot. Partial Summ. J. 3, ECF No. 122. Congressman Jefferson asserts that the evidence shows that at the time that iGate and ANJ entered into the Agreement, iGate had "very little to no business income, had a negative net worth, was severely undercapitalized and its shares of stock were worthless." *Id.* For support, Congressman Jefferson submitted an affidavit in which the Congressman swears that the fifth check that iGate paid to ANJ "bounced" and that when Congressman Jefferson asked iGate personnel about the bounced check, "iGate disclosed that iGate had a negative net worth and that it had no substantial current business, and thus no reliable or adequate cash flow." Jefferson Aff. ¶ 15, ECF No. 122. Congressman Jefferson also swears that the iGate shares used to compensate ANJ "had no book value and no market value." Jefferson Aff. ¶ 38, ECF No. 122. Thus, he asserts, "the stock was worthless." *Id.* Additionally, he swears that "iGate stock value never appreciated beyond a negative book value and the stock never reached a positive market value during any time that ANJ held any shares of iGate stock." *Id.* ¶ 41.

While it may be true that iGate suffered through financial difficulties, those difficulties do not change that Jackson used iGate funds to pay bribes to Congressman Jefferson.

Congressman Jefferson's evidence of these financial difficulties goes to the extent of damage that iGate incurred, rather than the existence of damage. Indeed, common sense and available case law indicate that a director or officer breaches his fiduciary duty when he pays bribes using corporate funds. *See In re Tenneco Sec. Litig.*, 449 F. Supp. 528, 531 (S.D. Tex. 1978) (holding that an economic loss in the amount of corporate funds expended for bribes results from a breach of fiduciary obligation); *In re BAE Sys. PLC Derivative Litig.*, No. 07-1646 (RMC), 2008 WL 458575, at *1 (D.D.C. Feb. 5, 2008) (on a motion for a temporary restraining order, holding that the plaintiff's complaint raised serious questions of law concerning whether the officer and director defendants breached their fiduciary duties when they used corporate assets to pay bribes). Using corporate funds for an illegal purpose is a breach of fiduciary duty, which causes damage to the corporation if only in the amount of those corporate funds expended. Additionally, the evidence shows that Congressman Jefferson and Jackson were both criminally prosecuted for their actions. Plea Agreement, ECF No. 113-18; Jefferson Jury Verdict, ECF No. 113-20. As a result of the criminal prosecution of its chairman and CEO, "iGate ceased its operations, closed its headquarters in Louisville, Kentucky and furloughed all of its employees." Verified Compl. ¶ 41, ECF No. 1. That iGate is no longer a going concern as a result of Congressman Jefferson's and Jackson's actions provides proof of damages to iGate. Thus, the Court finds that Jackson breached his fiduciary duty and caused damage to iGate when he paid bribes to Congressman Jefferson. Accordingly, Cadle has proven the first element of aiding and abetting a breach of fiduciary duty.

b. <u>Whether Congressman Jefferson Gave Substantial Assistance or Encouragement to Jackson</u>

The second element of aiding and abetting a breach of fiduciary duty requires Cadle to show that Congressman Jefferson gave "substantial assistance or encouragement" to Jackson.

*See Miles Farm Supply, LLC*, 595 F.3d at 666. Congressman Jefferson does not dispute this element. *See* Jefferson Resp. Opp. Mot. Partial Summ. J. 4, ECF No. 122. Cadle argues that Congressman Jefferson is precluded from disputing this element by virtue of his convictions under Counts 3 and 16 of his criminal case. Cadle Mem. Supp. Mot. Partial Summ. J. 15–17, ECF No. 113-1. The Court finds Congressman Jefferson's conviction under Count 16 to be preclusive here.

Count 16 of the indictment alleged that Congressman Jefferson violated 18 U.S.C. § 1962(c) and committed Racketeering Act 1 when he knowingly

> did demand, seek, receive, accept, *and* agree to receive and accept things of value from iGate for ANJ, a Jefferson family-controlled company, in the form of monthly payments of money, shares of profits and revenue, and iGate stock, in return for [Jefferson's] performance of official acts to advance iGate's business ventures in Nigeria, Ghana, and elsewhere.

Jefferson Indictment ¶ 226, 227, ECF No. 113-19 (emphasis added). Congressman Jefferson was convicted of Count 16, and the jury specifically found that Racketeering Act 1 had been proven. Jefferson Jury Verdict ¶ 16, ECF No. 113-20.

For issue preclusion to apply in this case, the Court must find that this element of aiding and abetting a breach of fiduciary duty was (1) raised and actually litigated in Congressman Jefferson's criminal trial and (2) necessary to the outcome of the prior proceedings.[4] *See Westport Ins. Corp.*, 2010 WL 4638760, at *3. According to the indictment, the jury needed to find that Congressman Jefferson *demanded*, *sought*, and *accepted* things of value from iGate to find that the prosecution had proven Racketeering Act 1. Jefferson Indictment ¶¶ 226, 227, ECF No. 113-19. Thus, Congressman Jefferson's assistance in Jackson's breach of fiduciary duty is apparent here because the Congressman not only sought but also accepted bribes from iGate. As

---

[4] As noted above, the parties do not dispute that the third and fourth criteria for applying issue preclusion are met. Thus, the Court will analyze only the first two criteria here.

discussed above, Jackson breached his duty when he used iGate funds to pay bribes to Congressman Jefferson.

These jury findings have a preclusive effect on this case because Count 16 of the indictment alleged that Congressman Jefferson demanded, sought, and accepted things of value from iGate. *Id.* Thus, this requirement under the second element of aiding and abetting breach of fiduciary duty was raised. Additionally, the jury found that these acts were proven beyond a reasonable doubt by the prosecution. Jefferson Jury Verdict ¶ 16, ECF No. 113-20. Thus, the issue was actually litigated. Finally, the statement in the indictment must have been proven at trial to support the jury's finding that Congressman Jefferson committed Racketeering Act 1. Thus, the issue was necessary to the outcome of Congressman Jefferson's criminal trial. As a result, Congressman Jefferson is precluded from contesting that the second element of aiding and abetting Jackson's breach of fiduciary duty is satisfied.

c.  Whether Congressman Jefferson Knew that Jackson was Breaching his Fiduciary Duty

The third element of aiding and abetting a breach of fiduciary duty requires Cadle to show that Congressman Jefferson knew that Jackson's conduct breached a fiduciary duty. *Miles Farm Supply, LLC*, 595 F.3d at 666. Actual knowledge is required under this element; Cadle cannot merely show constructive knowledge. *See id.* Likewise, establishing only negligence— that Congressman Jefferson should have known—does not suffice. *See Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 536–37 (6th Cir. 2000). But actual knowledge may be shown by circumstantial evidence. *Id.* And "the exact level of knowledge necessary for liability remains flexible and must be decided on a case-by-case basis." *Id.* at 535 (citing *Camp v. Dema*, 948 F.2d 455, 459 (8th Cir. 1991)).

15

Congressman Jefferson argues that issue preclusion cannot be applied here because the jury in his criminal case did not need to find that the Congressman knew Jackson was breaching his fiduciary duty. Jefferson Resp. Opp. Mot. Partial. Summ. J. 4, ECF No. 122. But Cadle does not rely on issue preclusion to show this element. Rather, Cadle points to circumstantial evidence in the record and asks this Court to draw an inference as to Congressman Jefferson's knowledge. Cadle Mem. Supp. Mot. Partial Summ. J. 19, ECF No. 113-1. Thus, Congressman Jefferson's arguments against issue preclusion here are unavailing.

In support of his argument, Cadle cites to the fact that Congressman Jefferson is a lawyer who obtained his law degree from Harvard Law School. *Id.* at 18. Cadle asserts, "It is absurd to think any attorney would be unaware that soliciting and accepting bribes from Jackson would be a breach of Jackson's fiduciary duty." *Id.* Congressman Jefferson responds that his education does not allow an inference that he knew that Jackson was breaching his fiduciary duty by paying bribes to the Congressman. Jefferson Resp. Opp. Mot. Partial Summ. J. 4, ECF No. 122. He asserts that defense counsel in his criminal case urged that Congressman Jefferson's conduct was lawful. *Id.* Additionally, he asserts that the judge in that case was so unsure about whether Congressman Jefferson's conduct was lawful that he released the Congressman on bond pending appeal. *Id.* Thus, he posits the question: "[i]f seasoned attorney's [sic] for Jefferson's defense and a distinguished judge with years of trial experience under his belt" were unsure about the legality of Congressman Jefferson's conduct, "how can plaintiff's suggestion that it is 'absurd' for a court to find otherwise carry the day?" *Id.* The Court need not decide whether Congressman Jefferson knew of the breach based on the Congressman's education alone.

In addition to Congressman Jefferson's education, Cadle points to a telephone conversation between Jackson and the Congressman that the Federal Bureau of Investigation

recorded. Cadle Mem. Supp. Mot. Partial Summ. J. 18, ECF No. 113-1. In that telephone conversation, Congressman Jefferson is recorded as mentioning a risk of going to a "pokey" if they did not get the "company out of trouble" in the right way. Telephone Tr. 1, ECF No. 113-22. At Congressman Jefferson's criminal trial, Jackson explained his understanding of the context of that telephone conversation. Trial Tr. 97–98, ECF No. 113-5. First, he explained that the "company" to which Congressman Jefferson was referring was iGate. *Id.* at 97. Then he explained that "pokey" is slang for jail. *Id.* at 98. Finally, he explained that he understood Congressman Jefferson to be saying that they would both be going to jail "[b]ecause of the nature of the business dealings that the congressman and [Jackson] had been having, in particular, were not above-board." *Id.* Cadle argues that, combined, Congressman Jefferson's education and this "demonstrated subjective understanding of the wrongfulness of the duo's actions" show actual knowledge. Cadle Mem. Supp. Mot. Partial Summ. J. 19, ECF No. 113-1.

Congressman Jefferson responds that Jackson's testimony mischaracterized the telephone conversation. Jefferson Resp. Opp. Mot. Partial Summ. J. 4, ECF No. 122. He submits a longer transcript of the recording in his affidavit, in which he also explains his understanding of the context of the conversation. Jefferson Aff. ¶¶ 34–35, ECF No. 122. He asserts that before the recording, Jackson had informed Congressman Jefferson that he intended to unilaterally terminate iGate's agreement with Mody's company, W2. *Id.* ¶ 34. According to Congressman Jefferson, he was merely trying to prevent Jackson from doing so. *Id.* ¶ 35. Thus, Congressman Jefferson argues, he was not concerned about going to the "pokey" because of a bribery scheme, but rather because Jackson was threatening to wrongfully retain the money that Mody had paid to iGate. Jefferson Resp. Opp. Mot. Partial Summ. J. 4, ECF No. 122. The Court finds both explanations of this conversation are plausible.

But the Court need not decide which interpretation of this conversation is accurate because the Court is otherwise persuaded that Congressman Jefferson knew that Jackson was breaching his fiduciary duty by paying bribes to the Congressman. First, it can be presumed that Congressman Jefferson knew that Jackson was a fiduciary of iGate, particularly given that the Congressman is a lawyer. Directors and officers of corporations are "classic fiduciaries" and presumed to owe such duties. *Miles Farm Supply*, 595 F.3d at 666. Second, there is no doubt that Congressman Jefferson knew that Jackson was paying iGate funds to the Congressman through ANJ. Invoices from ANJ were either delivered to Jackson by Congressman Jefferson in person or by facsimile. Trial Tr. 25, ECF No. 113-7. At least one of these invoices contained Congressman Jefferson's handwriting. *Id.* at 38. In fact, wire transfers to ANJ were being routed to an account listed in Congressman Jefferson's name. Jefferson Dep. 47–50, ECF No. 113-4. Thus, Congressman Jefferson knew that Jackson was paying him iGate funds.

Moreover, there is no doubt that Congressman Jefferson knew that it would be wrongful for Jackson to pay the Congressman iGate funds. After the Army began testing iGate technology, Congressman Jefferson told Jackson that the Congressman "could no longer spend the time with [Jackson] or work with [Jackson] on this product and services." Trial Tr. 141–42, ECF No. 113-2. Congressman Jefferson suggested that Jackson work with ANJ. *Id.* at 142. Congressman Jefferson assured Jackson that it would be permissible to do business with ANJ because the Congressman had no interest in the company. *Id.* But that assurance apparently was not true because Jackson soon noticed that he was still working with Congressman Jefferson, even though he was purportedly working with ANJ. *Id.* at 164. Congressman Jefferson's assurances to Jackson that it would be permissible to do business with ANJ because the Congressman was not a part of ANJ indicates to this Court that Congressman Jefferson had knowledge that it would be

wrongful for Jackson to pay the Congressman iGate funds for Congressman Jefferson's services as a Congressman. This evidence shows that Congressman Jefferson was attempting to hide the relationship between him and iGate, indicating his knowledge of the wrongfulness.

Finally, because "the exact level of knowledge necessary for liability remains flexible and must be decided on a case-by-case basis," *Aetna Cas. & Sur. Co.*, 219 F.3d at 535, the Court is comfortable here drawing an inference that Congressman Jefferson had awareness, given how involved he was in Jackson's breach. This case is unlike other cases that discuss aiding and abetting breach of fiduciary duty because here, the breach is payment of bribes and the defendant at issue is the person demanding and accepting those bribes. Congressman Jefferson was intrinsically involved in Jackson's breach of fiduciary duty. Accordingly, Cadle has shown the third element of aiding and abetting breach of a fiduciary duty, and the Court will grant summary judgment to Cadle on this claim against Congressman Jefferson.

### 2. Unjust Enrichment (Count IV)

As a preliminary matter, Congressman Jefferson moves for partial summary judgment on the unjust enrichment claim against him. Jefferson Mot. Partial Summ. J. 1–2, ECF No. 121. He asserts that Cadle claims rights against him "based both on a theory of a failure to adhere to the terms of the Agreement in paying for stock options and of unjust enrichment." *Id.* at 2. He argues that a breach of contract claim and an unjust enrichment claim cannot be pursued simultaneously, so the unjust enrichment claim must be dismissed. *Id.* Cadle responds that he has not alleged breach of contract, but rather uses language in the Agreement as evidence to illustrate the relationship between ANJ and iGate, and to demonstrate the agreed-upon value of iGate stock. Cadle Resp. Opp. Mot. Partial Summ. J. 5, ECF No. 126. Cadle additionally argues that,

even if he had asserted a breach of contract claim, the law allows for pleading claims in the alternative. *Id.* at 6.

Cadle is correct. He has not asserted any claims against Congressman Jefferson for breach of contract. All of Cadle's claims sound either in tort[5] or statute. In his reply, Congressman Jefferson asserts that Cadle has somehow implied a claim for breach of contract by "asking this court to enforce contract provisions against" him. *See* Jefferson Reply 2, ECF No. 131. Congressman Jefferson supports his argument by pointing to the facts that Cadle seeks damages to be measured based on the Agreement's provision calculating iGate stock prices at $2.50 per share and that Cadle "contends throughout violations by Jefferson under contract provisions between iGate and ANJ." *Id.* Congressman Jefferson's argument lacks merit. There are no implied claims for breach of contract asserted against Congressman Jefferson. Cadle merely cites to the Agreement for evidence supporting his figure for damages and to show that an agreement existed between iGate and ANJ. As such, the Court will deny Congressman Jefferson's motion for partial summary judgment on the unjust enrichment claim against him.

Cadle also moves for summary judgment against Congressman Jefferson on Count IV for unjust enrichment. Cadle Mem. Supp. Mot. Partial Summ. J. 19, ECF No. 113-1. To prevail on a claim for unjust enrichment, Cadle must prove three elements: "(1) benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit without payment for its value." *See Jones v. Sparks*, 297 S.W.3d 73, 78 (Ky. Ct. App. 2009) (citing *Guarantee Elec. Co. v. Big Rivers Elec. Corp.*, 669 F. Supp. 1371, 1380–81 (W.D. Ky. 1987)).

---

[5] Breach of fiduciary duty (Count I) and aiding and abetting a breach of fiduciary duty (Count II) both sound in tort. 37 C.J.S. *Fraud* § 15. Negligent or fraudulent misrepresentation or omission (Count III) is a tort. *Id.* § 74. Civil conspiracy (Count VII) is a means for holding those who did not commit a tort liable for that tort. 15A C.J.S. *Conspiracy* § 1.

a. Whether a Benefit was Conferred upon Congressman Jefferson at iGate's Expense

Cadle argues that Congressman Jefferson is precluded from disputing the first element of unjust enrichment because of the Congressman's convictions under Counts 3 and 16 of his indictment. Cadle Mem. Supp. Mot. Partial Summ. J. 19, ECF No. 113-1. The Court finds Congressman Jefferson's conviction under Count 16 to be preclusive as to the first element.

The first element of unjust enrichment requires proof that a benefit was conferred upon Congressman Jefferson at iGate's expense. *See Jones*, 297 S.W.3d at 78. Cadle asserts that Congressman Jefferson's conviction under Count 16 satisfies the first element of unjust enrichment because it "demonstrate[s] that Jefferson realized a benefit from iGate, at the expense of the entity's investors." Cadle Mem. Supp. Mot. Partial Summ. J. 20, ECF No. 113-1. Congressman Jefferson argues that iGate's payments to the Congressman and ANJ were not at its expense, but rather to its benefit. *Id.*

Count 16 of the indictment alleged that Congressman Jefferson violated 18 U.S.C. § 1962(c) and committed Racketeering Act 1 when he knowingly

> did demand, seek, receive, accept, *and* agree to receive and accept things of value from iGate for ANJ, a Jefferson family-controlled company, in the form of monthly payments of money, shares of profits and revenue, and iGate stock, in return for [Jefferson's] performance of official acts to advance iGate's business ventures in Nigeria, Ghana, and elsewhere.

Jefferson Indictment ¶ 226, 227, ECF No. 113-19 (emphasis added). Congressman Jefferson was convicted of Count 16, and the jury specifically found that Racketeering Act 1 had been proven. Jefferson Jury Verdict ¶ 16, ECF No. 113-20.

This conviction lines up with the first element of unjust enrichment because, according to the indictment, the jury needed to find that Congressman Jefferson received things of value for ANJ in the form of monthly payments, shares of profits, and iGate stock. *See* Jefferson

21

Indictment ¶ 226, 227, ECF No. 113-19. This information shows that the jury believed beyond a reasonable doubt that a benefit was conferred upon Congressman Jefferson. This benefit was also at iGate's expense because the indictment also required the jury to believe that the things of value came from iGate. *See id.*

For issue preclusion to apply in this case, the Court must find that the evidence required to satisfy this element of unjust enrichment was (1) raised and actually litigated in Congressman Jefferson's criminal trial and (2) necessary to the outcome of the prior proceedings. *See Westport Ins. Corp.*, 2010 WL 4638760, at *3. These jury findings have a preclusive effect on this case because Count 16 of the indictment alleged that Congressman Jefferson received things of value for ANJ from iGate. Thus, this requirement under the first element of unjust enrichment was raised. Additionally, the jury found that the prosecution had proven this allegation beyond a reasonable doubt. Thus, the issue was actually litigated. Finally, the statement in the indictment must have been proven at trial to support the jury's finding that Congressman Jefferson committed Racketeering Act 1. Thus, the issue was necessary to the outcome of Congressman Jefferson's criminal trial. As a result, Congressman Jefferson is precluded from contesting that the first element of unjust enrichment is satisfied.

### b.   Whether Congressman Jefferson Appreciated a Benefit

Cadle argues that Congressman Jefferson is also precluded from disputing the second element of unjust enrichment based on his convictions under Counts 3 and 16. Cadle Mem. Supp. Mot. Partial Summ. J. 19, ECF No. 113-1. Congressman Jefferson does not dispute that the second element of unjust enrichment is met. *See* Jefferson Resp. Opp. Mot. Partial Summ. J. 5, ECF No. 122. The second element of unjust enrichment requires a resulting appreciation of benefit by Congressman Jefferson. *See Jones*, 297 S.W.3d at 78. The Congressman's conviction

lines up with this element because Count 16 of the indictment required the jury to find that Congressman Jefferson knowingly received things of value. Jefferson Indictment ¶¶ 226, 227, ECF No. 113-19. As noted above, this jury finding has a preclusive effect because Count 16 of the indictment alleged that Congressman Jefferson knowingly received things of value. Thus, the issue was raised. Additionally, the jury specifically found that the prosecution had proven this allegation beyond a reasonable doubt. Thus, it was actually litigated. Finally, the allegation in the indictment had to have been proven to support the jury's finding and Congressman Jefferson's conviction. Thus, the issue was necessary to the outcome of Congressman Jefferson's criminal trial. Thus, Jefferson's conviction under Count 16 precludes Congressman Jefferson from disputing the second element of unjust enrichment.

In addition, the evidence shows that wire transfers to ANJ were routed to an account listed in Congressman Jefferson's name. Jefferson Dep. 47–50, ECF No. 113-4. Thus, apart from relying on issue preclusion, it appears from the evidence that Congressman Jefferson was aware of the resulting benefit he was receiving. Therefore, the second element of unjust enrichment is satisfied here.

     c. <u>Whether it Would be Inequitable for Congressman Jefferson to Retain the Benefit Without Payment for its Value</u>

The third element of unjust enrichment requires an inequitable retention of benefit without payment for its value. *See Jones*, 297 S.W.3d at 78. Cadle argues that the third element "is satisfied by the indisputable fact that the benefits were ill gotten gains." Cadle Mem. Supp. Mot. Partial Summ. J. 20, ECF No. 113-1. Cadle points this Court to Congressman Jefferson's convictions for Counts 12 and 14 as preclusive of this element of unjust enrichment. *Id.* Counts 12 and 14 of the indictment alleged that Congressman Jefferson committed money laundering.

Jefferson Indictment ¶ 216, ECF No. 113-19. Congressman Jefferson was convicted of Counts 12 and 14. Jefferson Jury Verdict ¶¶ 12, 14, ECF No. 113-20. The jury instructions required the jury to find that (1) Congressman Jefferson knowingly engaged or attempted to engage in a monetary transaction, (2) he knew the transaction involved criminally derived property, (3) the property was worth more than $10,000, (4) the property was derived from bribery, and (5) the transaction occurred in the United States. Trial Tr. 89–90, ECF No. 113-21. Specifically, in finding Congressman Jefferson guilty on Count 12, the jury found that the Congressman participated in transferring money from ANJ to a bank account payable to "Jefferson Committee." Jefferson Indictment ¶ 216, ECF No. 113-19. Similarly, in finding Congressman Jefferson guilty on Count 14, the jury found that the Congressman participated in transferring money from ANJ to a bank account in his own name. *Id.*

Cadle argues that "[t]hese convictions mean that the money that was being paid to ANJ was in fact being siphoned and retained by Jefferson himself" and thus preclude Congressman Jefferson from disputing the third element of unjust enrichment. Cadle Mem. Supp. Mot. Partial Summ. J. 21, ECF No. 113-1. Congressman Jefferson responds that "[t]here was clearly value received by iGate and its shareholders in essential services that Jefferson/ANJ provided to them." Jefferson Resp. Opp. Mot. Partial Summ. J. 5, ECF No. 122. After all, Jackson testified repeatedly that he continued to pay ANJ because Congressman Jefferson was providing valuable services. Trial Tr. 165, ECF No. 113-2 (noting that "the congressman had actually been very effective and resourceful in getting things done"); Trial Tr. 28, ECF No. 113-7 (noting that he would not have gotten a meeting with the Army Corps of Engineers without Congressman Jefferson's help); Trial Tr. 178–79, 193–94, ECF No. 113-2 (noting that iGate issued shares to

ANJ for free because Jackson felt that Congressman Jefferson was performing services for the shares).

While Congressman Jefferson may have provided services in exchange for payments from iGate funds, these transactions were unlawful. Congressman Jefferson derived the property from bribery, as the jury found when it convicted the Congressman of Counts 12 and 14. Trial Tr. 89–90, ECF No. 113-21; Jefferson Jury Verdict ¶¶ 12, 14, ECF No. 113-20. Courts generally hold that when the defendant's benefit is obtained through unlawful means, it is inequitable for the defendant to retain the benefit. *See, e.g.*, *Griffin v. Jones*, 975 F. Supp. 2d 711, 726–27 (W.D. Ky. 2013) (holding that plaintiff stated a claim for unjust enrichment when defendants obtained plaintiff's money by fraud and used it in furtherance of fraudulent schemes); *Wright v. Linebarger Googan Blair & Sampson, LLP*, 782 F. Supp. 2d 593, 610–11 (W.D. Tenn. 2011) (holding that plaintiff stated a claim for unjust enrichment when defendant allegedly charged an unlawfully high attorney fee).

This Court agrees that Congressman Jefferson's convictions under Counts 12 and 14 indicate that he obtained iGate funds through unlawful means and that his retention of those benefits is therefore inequitable. Congressman Jefferson's convictions have a preclusive effect on this case because the jury was required to find that the Congressman knowingly engaged or attempted to engage in a monetary transaction involving property unlawfully derived from bribery to find Congressman Jefferson guilty under Counts 12 and 14. Trial Tr. 89–90, ECF No. 113-21. Thus, the unlawfulness of Congressman Jefferson's receipt of a benefit was raised, actually litigated, and necessary to the conviction. Accordingly, Congressman Jefferson is precluded from contesting that the third element of unjust enrichment is satisfied. Because Cadle

has shown all three elements are met, the Court will grant summary judgment to Cadle on his unjust enrichment claim against Congressman Jefferson.

### 3.   Civil Conspiracy (Count VII)

Cadle moves for summary judgment against both Congressman Jefferson and Jackson on Count VII for civil conspiracy. Cadle Mem. Supp. Mot. Partial Summ. J. 21, 25, ECF No. 113-1. To prove civil conspiracy, Cadle must show a "corrupt or unlawful combination or agreement between two or more persons to do by concert of action an unlawful act, or to do a lawful act by unlawful means." *James v. Wilson*, 95 S.W.3d 875, 897 (Ky. Ct. App. 2002) (citing *Smith v. Bd. of Educ. of Ludlow*, 94 S.W.2d 321, 325 (Ky. 1936)). In other words, Cadle must prove (1) "an unlawful/corrupt combination or agreement" between Congressman Jefferson and Jackson (2) "to do by some concerted action an unlawful act." *Montgomery v. Milam*, 910 S.W.2d 237, 239 (Ky. 1995), *overruled on other grounds by Ballard v. 1400 Willow Council of Co-Owners, Inc.*, 430 S.W.3d 229, 236 (Ky. 2013).

The concerted action element is satisfied when damages are caused by "some overt act done pursuant to or in furtherance of the conspiracy." *James*, 95 S.W.3d at 897 (internal quotation marks omitted) (citing *Davenport's Adm'x v. Crummies Creek Coal Co.*, 184 S.W.2d 887, 888 (Ky. 1945)). Without conduct resulting in damages, there is no civil action for conspiracy. *Id.* Thus, the plaintiff must also show that the defendant's overt action injured him. *See id. See also Wallace v. Midwest Fin. & Mortg. Servs., Inc.*, 714 F.3d 414, 423 (6th Cir. 2013) ("The gist of the civil action for conspiracy is the act or acts committed in pursuance of the conspiracy, not the actual conspiracy—meaning a plaintiff must also prove that the act or acts caused her injuries.") (internal quotation marks omitted).

### a.   Civil Conspiracy Claim Against Congressman Jefferson

Cadle argues that Congressman Jefferson's conviction on Counts 1 and 16 preclude him from disputing either element of civil conspiracy. Cadle Mem. Supp. Mot. Partial Summ. J. 22, ECF No. 113-1. The Court finds that Count 1 is preclusive here. Count 1 of the indictment alleged:

> Beginning in or about January 2001 through in or about August 2005 . . . WILLIAM J. JEFFERSON, did knowingly combine, conspire, confederate, and agree, together with Vernon L. Jackson, Brett M. Pfeffer, and others known and unknown to the grand jury . . .
>
> [t]o provide for the unjust enrichment of Defendant JEFFERSON and his family members by corruptly seeking, soliciting, and directing that things of value be paid to him and his family members in return for Defendant JEFFERSON's performance of official acts. . . . To use the Office of Congressman WILLIAM J. JEFFERSON, including the congressional staff members employed therein, to perform official acts to advance the interests of the businesses and persons who had agreed to pay things of value to Defendant JEFFERSON and his family members.

Jefferson Indictment ¶¶ 40–42, ECF No. 113-19. Congressman Jefferson was convicted on Count 1. Jefferson Jury Verdict ¶ 1, ECF No. 113-20. To find Congressman Jefferson guilty on Count 1, the government needed to prove beyond a reasonable doubt: (1) "that the conspiracy, agreement, or understanding to commit bribery as charged in the indictment, honest services wire fraud as alleged in the indictment, or Foreign Corrupt Practices Act violation as alleged in the indictment, was formed or reached or entered into by two or more persons," (2) "that at some time during the existence of or life of the conspiracy, agreement or understanding, that the defendant knowingly and intentionally joined the conspiracy," and (3) that at some point "during the existence or life of the conspiracy, agreement or understanding, a member . . . of the conspiracy did one of the overt acts described in Count 1 of the indictment for the purpose of advancing, furthering or helping the object or purpose of the conspiracy." Trial Tr. 41–42, ECF No. 113-21.

Cadle asserts that the first two elements from Count 1 of Congressman Jefferson's criminal charges are preclusive as to the first element of civil conspiracy: "an unlawful/corrupt combination or agreement." Cadle Mem. Supp. Mot. Partial Summ. J. 23, ECF No. 113-1. For issue preclusion to apply here, the Court must find that the evidence to satisfy this element of civil conspiracy was (1) raised and actually litigated in Congressman Jefferson's criminal trial and (2) necessary to the outcome of the prior proceedings. *See Westport Ins. Corp.*, 2010 WL 4638760, at *3. The Court finds that Congressman Jefferson's conviction on Count 1 of his criminal indictment is preclusive on the first element of civil conspiracy. According to the jury instructions, the jury needed to find that Congressman Jefferson joined a conspiracy to commit one of three crimes. Trial Tr. 41–42, ECF No. 113-21. These findings satisfy the first element, "an unlawful/corrupt combination or agreement." These jury findings also have a preclusive effect on this case because the requirements for the jury to find Congressman Jefferson guilty of Count 1 were in the indictment and were in the jury instructions. Thus, they were raised. Additionally, the jury found that the requirements were proven by the prosecution because each element had to be proven beyond a reasonable doubt in order for the jury to find Congressman Jefferson guilty of Count 1. Thus, they were actually litigated and the requirements were necessary to the outcome of Congressman Jefferson's criminal trial. As a result, Congressman Jefferson is precluded from contesting that the first element of a civil conspiracy is satisfied.

Cadle asserts that the third element from Count 1 of Congressman Jefferson's criminal charges—that a member of the conspiracy did an overt act—is preclusive as to the second element of civil conspiracy: "some overt act done pursuant to or in furtherance of the conspiracy," which results in damages to the plaintiff. Cadle Mem. Supp. Mot. Partial Summ. J. 23, ECF No. 113-1. The jury found that Congressman Jefferson was guilty on Count 1. Thus, the

jury found that a member of their conspiracy committed an overt act in furtherance of the conspiracy. As above, this finding also has a preclusive effect on this case because (1) the element was in the indictment and jury instructions, so it was raised, and (2) the element had to be proven at trial in order for the jury to find Congressman Jefferson guilty on Count 1, so it was actually litigated and necessary to the outcome of the Congressman's criminal trial. Thus, Congressman Jefferson is precluded from contesting that a member of the conspiracy committed an overt act in furtherance of the conspiracy.

But the jury's finding that Congressman Jefferson was guilty on Count 1 does not establish that the overt act resulted in damages to iGate. For this point, Cadle cites to evidence in the record for support. *Id.* at 23–24. Cadle asserts:

> uncontroverted evidence in the record shows that overt acts in furtherance of the Jackson/Jefferson conspiracy included payments by Jackson, out of iGate funds in the amount of $391,990.71 over four years, and issuance, without consideration, of seven hundred and seventy-five thousand (775,000) shares of iGate stock, valued (via the exercise price) at $2.50 per share by the Professional Services Agreement between Jackson and Jefferson (for a total of $1,937,500 value in shares).

*Id.* Congressman Jefferson does not dispute these facts in his response.[6] He instead argues that his criminal conviction under Count 1 does not prove that he conspired with Jackson or iGate in particular or that he caused monetary damages to iGate. Jefferson Resp. Opp. Mot. Partial Summ. J. 5, ECF No. 122. But Cadle relies not on issue preclusion, but on evidence in the record for this point.

The Court agrees with Cadle here. The evidence in the record shows that iGate agreed to pay ANJ $7,500 per month. Agreement ¶ 3, ECF No. 113-6. In fact, wire transfers from iGate to ANJ were being routed to an account listed in Congressman Jefferson's name. Jefferson Dep.

---

[6] Except to mention in passing that a "great deal of what [Cadle] sets out as facts are in fact arguments." Jefferson Resp. Opp. Mot. Partial Summ. J. 5, ECF No. 122.

47–50, ECF No. 113-4. As discussed above in the "aiding and abetting a breach of fiduciary duty" section, iGate was damaged, if only in the amount of corporate funds expended, when Jackson used corporate funds to pay Congressman Jefferson for an illegal purpose. Additionally, the evidence shows that Congressman Jefferson and Jackson were both criminally prosecuted for their actions. Plea Agreement, ECF No. 113-18; Jefferson Jury Verdict, ECF No. 113-20. As a result of the criminal prosecution of its chairman and CEO, iGate "ceased its operations, closed its headquarters in Louisville, Kentucky, and furloughed all of its employees." Verified Compl. ¶ 41, ECF No. 1. That iGate is no longer a going concern as a result of Congressman Jefferson's and Jackson's actions is proof of damage to iGate. Accordingly, the Court will grant summary judgment to Cadle on his civil conspiracy claim against Congressman Jefferson.

### b.  Civil Conspiracy Claim Against Jackson

Cadle argues that Jackson is also precluded from denying the elements of civil conspiracy because of the plea agreement Jackson entered into on May 3, 2006. Cadle Mem. Supp. Mot. Partial Summ. J. 25, ECF No. 113-1. "[A] guilty plea may be used to establish issue preclusion in a subsequent civil suit." *In re Mitchell*, No. 97-5182, 1997 WL 693437, at *1 (6th Cir. Oct. 31, 1997) (citing *Appley v. West*, 832 F.2d 1021, 1026 (7th Cir. 1987)). Jackson pled guilty to conspiracy to commit bribery of a public official in violation of 18 U.S.C. § 371. Jackson Plea Agreement 1, ECF No. 113-18. That statute reads:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 371. Thus, there are two elements to this criminal statute: (1) two or more persons conspiring either to commit an offense or defraud the United States and (2) one or more of such

persons doing any act to effect the object of the conspiracy. *See id.* These elements nearly mirror the elements of civil conspiracy: (1) "an unlawful/corrupt combination or agreement" between Congressman Jefferson and Jackson (2) "to do by some concerted action an unlawful act." *See Montgomery*, 910 S.W.2d at 239. Thus, the Court finds that Jackson's guilty plea on his conspiracy charge is preclusive on the first element of civil conspiracy, as well as on the "overt act" portion of the second element.

And like above, the evidence in the record establishes that a member of the conspiracy's overt act resulted in damages to iGate. When Jackson made unlawful payments of iGate funds to Congressman Jefferson, those payments damaged iGate, if only in the amount of the funds expended to pay him. Additionally, as discussed above, Congressman Jefferson's and Jackson's actions resulted in the criminal prosecution of Jackson and iGate is no longer a going concern because of Jackson's criminal prosecution, which indicates damage to iGate. Accordingly, the Court will grant summary judgment to Cadle on his civil conspiracy claim against Jackson.

### 4.   Whether to Set Damages at This Time

Cadle urges this Court to set damages in the amount of $2,329,490.71. Cadle Mem. Supp. Mot. Partial Summ. J. 19, 21, 24, 25, 27, ECF No. 113-1. He argues that this is the total amount iGate paid to Congressman Jefferson, including "cash compensation from iGate in the total amount of $391,990.71" and 775,000 iGate shares valued at $2.50 per share. *Id.* at 8. Both Congressman Jefferson and Jackson argue that Cadle's calculation of damages is flawed. Jefferson Resp. Opp. Mot. Partial Summ. J. 4, ECF No. 122; Jackson Resp. Opp. Mot. Partial Summ. J. 2, ECF No. 119.

### a.   Congressman Jefferson's Arguments

In fact, Congressman Jefferson moves for partial summary judgment on damages. Congressman Jefferson moves for summary judgment "with respect to every claim Cadle makes in his motion for partial summary judgment" because he argues that he is not liable for any damages claimed. Jefferson Mot. Partial Summ. J. 1, ECF No. 122. He asserts three arguments here. First, Congressman Jefferson argues that "under whatever theory of liability that may be proven at trial, [he] cannot be liable for the value of iGate stock set out in the Agreement, as he never agreed to pay any price per share for the stock ANJ received." *Id.* He asserts that he was not a party to the Agreement between iGate and ANJ and thus was not in privity of contract with iGate or Cadle. *Id.* Cadle interprets Congressman Jefferson's argument as an assertion of the corporate veil defense and responds that the Congressman cannot use ANJ as a shield from liability because his claims are against Congressman Jefferson in his personal capacity. Cadle Resp. Opp. Mot. Partial Summ. J. 2, ECF No. 126. The Court does not interpret Congressman Jefferson's argument as Cadle does. The Court will instead address the plain language of the Congressman's argument. The Court interprets Congressman Jefferson's argument as asserting that he cannot be bound to the exact calculation of the value of iGate stock which was outlined in the Agreement because he was not a party to that Agreement. The Court agrees with Congressman Jefferson and finds that he cannot be bound to the terms of an agreement that he did not sign. But this finding does not preclude Cadle from holding Congressman Jefferson liable for damages he caused. Thus, the Court will deny Congressman Jefferson's motion for partial summary judgment on this first ground.

Second, Congressman Jefferson argues that Cadle's investment in iGate was lost before the Congressman and iGate began interacting with one another. Jefferson Mot. Partial Summ. J. 1, ECF No. 121. Thus, Congressman Jefferson argues that because "iGate had a negative net

worth prior to [that relationship] . . . neither Cadle nor iGate has any claim for damages" against him. *Id.* As discussed above, while iGate might have suffered financially, those difficulties do not change that Jackson used iGate funds to bribe Congressman Jefferson. Congressman Jefferson's evidence of these financial difficulties goes to the extent of damage that iGate incurred, not the existence of damage. Thus, the Court will deny Congressman Jefferson's motion for partial summary judgment on this second ground.

Third and finally, Congressman Jefferson argues in his reply that iGate's rescission of ANJ's shares is dispositive. Jefferson Reply 2, ECF No. 131. Jackson argued the same point— that valuation of the shares for the purpose of a damages calculation is a moot point because of iGate's recent invalidation and rescission of the shares—in his response to Cadle's motion for partial summary judgment. Jackson Resp. Opp. Mot. Partial Summ. J. 2, ECF No. 119. After Cadle's instant motion for partial summary judgment, Jackson executed a board resolution rescinding ANJ's remaining 775,000 shares of iGate stock, "effective as of January 25, 2010." Jackson Aff. ¶¶ 5–6, ECF No. 119-1; Dec. 28, 2016 Rescission, ECF No. 119-3. Cadle argues in his reply that this rescission is not valid and does not adequately compensate iGate because the value of iGate stock at the time of the rescission was likely not the value of iGate stock at the time it was issued to ANJ. Cadle Reply 2–3, ECF No. 127.

The Court finds that Jackson's transfer of iGate stock to ANJ did not damage iGate because there is no evidence presented of injury to iGate as a result of this transfer. According to the evidence, Jackson issued shares of iGate stock to ANJ. Stock Docs., ECF No. 113-8; Jefferson Dep. 22–30, ECF No. 113-4; Trial Tr. 178–80, 191–94, ECF No. 113-2. Although the Agreement set the price of these shares at $2.50 per share, Jackson issued the shares to ANJ for free. Jefferson Dep. 22–30, ECF No. 113-4; Trial Tr. 178, ECF No. 113-2. Jackson then

rescinded those shares. Jackson Aff. ¶¶ 5–6, ECF No. 119-1; Dec. 28, 2016 Rescission, ECF No. 119-3. Thus, iGate has no outstanding claim over the shares themselves. And in the interim when ANJ held the shares, there is no evidence that iGate was injured by ANJ's holding of the shares. Cadle has not presented this Court with any evidence, for example, that iGate needed to use those shares for some purpose and could not because ANJ held them. Instead, it appears to this Court simply that Jackson gave intangible shares of iGate to ANJ, and that Jackson then rescinded those intangible shares of iGate. The Court seeing no injury to iGate, it will grant summary judgment to Congressman Jefferson to the extent that he asserts that iGate is not entitled to any damages for the transfer of iGate stock to ANJ.

### b. Jackson's Arguments

Jackson addresses Cadle's damage calculation in his response to Cadle's motion for partial summary judgment. Jackson first takes issue with Cadle's attempt to hold Jackson liable for damages suffered by iGate. Jackson asserts that Cadle is "attempting to saddle Jackson for the wrong doing of the Congressman." Jackson Resp. Opp. Mot. Partial Summ. J. 8, ECF No. 119. He asserts that Cadle has not shown that *Jackson* caused iGate's damages. *Id.* But the evidence is clear that Jackson was the CEO, chairman, and sole director of iGate. Jackson Interrog. Answers ¶ 2, ECF No. 127-1. As CEO, chairman, and sole director, Jackson issued $362,500 in checks and wire transfers to ANJ despite knowing that he was actually paying Congressman Jefferson to promote "iGate's products and services from his congressional offices." iGate Payments, ECF No. 113-17; Trial Tr. 166–67, ECF No. 113-2. As a result of these wrongful payments, Jackson pled guilty to (1) conspiracy to commit bribery of a public official under 18 U.S.C. § 371 and (2) bribery of a public official under 18 U.S.C. § 201. Plea Agreement 1, ECF No. 113-18. iGate then "ceased its operations, closed its headquarters . . . ,

34

and furloughed all of its employees." Verified Compl. ¶ 41, ECF No. 1. This Court agrees with Cadle that there is no question that Jackson was a cause of iGate's damages. By agreeing to pay iGate funds to Congressman Jefferson, through ANJ, and by actually paying those funds to the Congressman, Jackson used iGate funds for an illegal purpose. This damaged iGate.

As to the cash payments specifically, Jackson responds that "[w]hile the facts speak for themselves as to the payments made . . . these payments were none the less legal payments made pursuant to a legitimate contractual obligation." Jackson Resp. Opp. Mot. Partial Summ. J. 2, ECF No. 119. Jackson later points this Court to his affidavit to show that the Agreement between iGate and ANJ "was found to be invalid." *Id.* at 7. In his affidavit, Jackson swears that the judge presiding over Congressman Jefferson's criminal sentencing had opined that "any and all agreements between iGate and [ANJ] were illegal and void and that any and all compensation paid to [ANJ] should be returned to iGate." Jackson Aff. ¶ 3, ECF No. 119-1.

The Court agrees with this sentiment. In Kentucky, where the object or tendency of a contract is to constitute a breach of fiduciary duty, the contract is illegal and void. *Kessler v. Jefferson Storage Corp.*, 125 F.2d 108, 110 (6th Cir. 1941) (citations omitted). As discussed above, Jackson breached his fiduciary duty by his actions. The Agreement between iGate and ANJ, which was apparently created for the sole purpose of allowing iGate to deal with ANJ nominally while continuing to work with Congressman Jefferson in fact, is illegal and void. Because iGate and iGate's shareholders were innocent third parties who have been detrimentally affected by this illegal contract entered into by their fiduciary, Jackson, equity dictates that iGate is entitled to recover the consideration paid to ANJ. *See* 8 Williston on Contracts § 19:82 ("If a trustee or guardian entered into an illegal transaction so that any consequences will fall, not on the guilty fiduciary, but on the beneficiary, relief is generally afforded . . . by permitting the

innocent beneficiary . . . to rescind and recover any consideration paid."). Thus, iGate is entitled to receive the cash payments made to ANJ through iGate's illegal Agreement with ANJ. iGate paid ANJ $362,500 in checks and wire transfers. Additionally, iGate paid Congressman Jefferson's American Express credit card bill twice during the time of the Agreement in the amount of $29,493.71. These amounts total to $391,993.71.[7]

As for the iGate shares that were issued to ANJ for free, the Court has determined above that iGate was not injured by Jackson's transfer of iGate shares to ANJ. The Court will grant summary judgment to Congressman Jefferson to the extent that he asserts that iGate is not entitled to any damages for the transfer of iGate stock to ANJ. Accordingly, the Court will deny summary judgment to Cadle to the extent that he asks this Court to set damages at the requested $2,329,490.71. The Court will award iGate $391,993.71 in compensatory damages for the cash payments made by iGate to ANJ.

V.    Conclusion

The Court will grant in part and deny in part Cadle's motion for partial summary judgment. The Court will grant summary judgment to Cadle against Congressman Jefferson on Count II for aiding and abetting a breach of fiduciary duty, Count IV for unjust enrichment, and Count VII for civil conspiracy. The Court will grant summary judgment to Cadle against Jackson on Count VII for civil conspiracy. The Court will award iGate $391,993.71 in compensatory damages.

The Court will grant in part and deny in part Congressman Jefferson's motion for partial summary judgment. The Court will grant summary judgment to Congressman Jefferson to the

---

[7] Cadle requests $391,990.71 in his motion. Because the evidence indicates that iGate is entitled to $391,993.71 instead, the Court will award iGate $391,993.71.

36

extent that he asserts that iGate is not entitled to any damages for the transfer of iGate stock to ANJ. The Court will deny summary judgment to Congressman Jefferson in all other respects.

An order will be entered in accordance with this memorandum opinion.

July 14, 2017

Charles R. Simpson III, Senior Judge
United States District Court